# UNITED STATES DISTRICT COURT

for the

Middle District of Tennessee

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

INFORMATION ASSOCIATED WITH GMA STORED AT
PREMISES OWNED BY QUEST DIAGNOSTICS AT
6431 LONGHORN DR., IRVING, TEXAS 75063

)
)
)
)
)
)

Case No.  20-mj-2545

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____Northern_____ District of _____Texas_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

❑ evidence of a crime;

❑ contraband, fruits of crime, or other items illegally possessed;

❑ property designed for use, intended for use, or used in committing a crime;

❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21/841, 846 | Unlawful distribution of controlled substances, Conspiracy |

The application is based on these facts:

See attached affidavit.

❑ Continued on the attached sheet.

❑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____/s/Tony Janutolo_____
*Applicant's  signature*

Tony Janutolo, DEA TFO
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ *(specify reliable electronic means).*

Date:  ___October 9, 2020___

*Judge's signature*

City and state:  ___Nashville, Tennessee___

Hon. Jeffery S. Frensley, U.S. Magistrate Judge
*Printed name and title*

Print    Save As...    Attach    Reset

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED
GATEWAY MEDICAL ASSOCIATES
THAT IS STORED AT PREMISES
OWNED BY QUEST DIAGNOSTICS
AT 6431 LONGHORN DR., IRVING,
TEXAS 75063

Case No. 20-mj-2545

**SUBMITTED UNDER SEAL**

## AFFIDAVIT IN SUPPORT OF SEARCH
## WARRANT APPLICATION

I, Task Force Officer Anthony Janutolo of the Drug Enforcement Agency ("DEA"),

being duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I have been a DEA Task Force Officer since March 2019.  I am employed by

the Kentucky Office of the Attorney General and have been so employed for approximately

5 ½ years.  During this time, I have been assigned to the Appalachian High Intensity Drug

Trafficking Area ("AHIDTA") Diversion Task Force.  My duties since joining the Task

Force have consisted, in part, of investigating illegal drug trafficking organizations and

diversion of controlled substance offenses. Through my training and duties in this capacity,

I have participated and assisted in numerous state and federal investigations involving

multi-state drug trafficking organizations conspiring with providers and pharmacists in the

distribution of controlled substances. During these investigations, the Affiant has acted in

an undercover capacity and purchased narcotics from these organizations. The Affiant has

participated in the debriefing of witnesses, cooperating sources of information, and defendants regarding the modus operandi of narcotics traffickers and the diversion of controlled substances.

2.     I have been a law enforcement officer since June of 1995.  Prior to being employed by the Kentucky Attorney General and assigned to the Drug Enforcement Administration, I retired from the Kentucky State Police.  During this time, I served as a uniformed Trooper and a narcotics detective assigned to the Drug Enforcement and Special Investigations Unit.  In addition to the Kentucky State Police basic law enforcement training academy, I completed training in drug conspiracy investigations, money laundering, financial investigations and undercover operations.

3.     As a federal Task Force Officer, I am authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States.

## REQUESTED WARRANT

4.     This investigation pertains to Dr. James Maccarone, a physician who practices in or around Clarksville, Tennessee, and others affiliated with a medical practice named Gateway Medical Associates, P.C. ("GMA"), for potential violations of Title 21 U.S.C. §§ 841 and 846.  Dr. Maccarone owns GMA, located at 751 Chesapeake Lane, Suite 101, Clarksville, Tennessee 37040.  According to records I reviewed from the Tennessee Secretary of State, the initial filing for GMA was February 4, 2000.

5.     This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) for information associated GMA that is stored at premises owned, maintained, controlled, or operated by Quest Diagnostics

("Quest") at 6431 Longhorn Dr., Irving, Texas 75063. The requested warrant would require Quest to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications. The information to be searched is described in the following paragraphs and in Attachments A and B.

## BACKGROUND ON QUEST

6. Quest provides an Electronic Health Record (EHR) called Quanum Electronic Health Record (Quanum EHR). According to Quest, GMA has Quanum EHR accounts and has since March 1, 2011, under account 16079 SKB and account 16079 NAS. Data relating to the accounts is stored at Quest Diagnostics' Texas Data Center, 6431 Longhorn Dr. Irving, Texas 75063. Quest also stated that both Dr. Maccarone and Dr. Stanton are associated with the aforementioned accounts.

7. According to the Quest website, Quanum EHR is a cloud-based EHR that offers a "comprehensive, fully-mobile, and secure platform that helps keep medical practices efficient and profitable. Experience a robust solution that offers dynamic access to key patient information anytime, anywhere." Further, the website states that the features include: electronic lab management, ePrescribing, analytics, including patient histories and trends.

## JURISDICTION

8. Under 18 U.S.C. § 2703(a), the Government "may require the disclosure by a provider of [an] electronic communication service of the contents of a wire or electronic communication, that is in electronic storage in an electronic communications system . . .

3

only pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . by a court of competent jurisdiction." *See also* 18 U.S.C. § 2703 (b)(1)(A), (c)(1)(A). A "court of competent jurisdiction" to issue the type of warrant requested here includes "any district court of the United States (including a magistrate judge of such a court) . . . that . . . has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

9. Quest provides customers an "electronic communication service" as that term is defined by 18 U.S.C. § 2510(12), and/or a "remote computing service" as that term is defined by 18 U.S.C. § 2711(2).

10. This Court has jurisdiction to issue the requested warrant, because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. See 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that . . . has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As described in the paragraphs below, my investigation indicates that the criminal offenses at issue have occurred, among other places, in the Eastern District of Kentucky.

## OVERVIEW OF FEDERAL CONTROLLED SUBSTANCE LAWS

11. Under 21 U.S.C. § 841(a)(1), it is "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance" unless otherwise authorized by law. In turn, conspiring (or attempting to conspire) with another to unlawfully distribute or dispense a controlled substance is a violation of 21 U.S.C. § 846.

4

12. Certain professionals, including doctors and pharmacists, are authorized to dispense controlled substances, *see* 21 C.F.R. § 1306.03-06, but only so long as they comply with federal law, including the regulations promulgated pursuant to 21 U.S.C. § 821.

13. Under those regulations, "[a] prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04.

14. The prescribing practitioner is responsible for the proper prescribing and dispensing of controlled substances. A prescription issued outside the usual course of professional treatment is not a valid prescription within the meaning and intent of the Controlled Substances Act. *See* 21 U.S.C. § 829. Any person knowingly issuing such a prescription shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

## BACKGROUND ON CONTROLLED SUBSTANCE DIVERSION

15. Through my training and experience, and conversations with other experienced investigators and law enforcement personnel, I have become familiar with tactics utilized by physicians involved in the improper prescribing of controlled substances. My knowledge of these tactics includes, but is not limited to, the following:

    (a) In the operation of a diverted pharmaceutical distribution system, the pharmaceuticals are produced legally in the United States and foreign countries and are first sold to wholesale distributors in the United States. The wholesale distributors then resell the pharmaceuticals to pharmacies who dispense them

5

to persons who are prescribed the medication by a licensed practitioner. Although the pharmaceuticals are sometimes diverted by theft, the majority are diverted through illegal acts on the part of practitioners and/or the person to whom they are prescribed, or a combination of the two.

(b) In cases involving the large-scale diversion of pharmaceuticals, unethical and illegal acts on the part of practitioners are essential. I am aware that these illegal practitioners often operate from behind the veil of a medical practice whose purpose purports to be the treatment of chronic pain, otherwise known as "pain clinics." These pain clinics sometimes, but not always, operate on a cash-only (or cash-equivalent, such as money orders and pre-paid debit cards) basis and do not accept insurance, Medicare, or Medicaid. Often persons with little or no medical experience own these clinics, either directly or through a silent-partner model, and employ unethical practitioners to further the enterprise. Additionally, pain clinics tend to accept, service, and, in many instances, cater to patients traveling from substantial distances (sometimes several states removed from the location of the pain clinic), in addition to serving local patients.

(c) Illegally operating pain clinics frequently require Magnetic Resonance Imaging (MRI) as supporting documentation for each patient, but otherwise make little or no attempt to contact prior doctors of any patient in order to obtain any prior medical history and/or records. Pain clinics often conduct urinalysis drug screens or blood tests to determine if a patient has used any drug beside the

6

prescribed medication. These tests tend to be cursory and can be easily tampered with. Pain clinics that operate in this manner essentially offer only narcotic therapy – usually providing prescriptions of oxycodone in varying short-release formulations. Pain clinics typically do not offer physical therapy or other non-narcotic options for the treatment of pain and often document having counseled each patient on issues such as weight loss and smoking cessation, which counseling is, at best, cursory.

(d) The operation of a pain clinic for the purpose of diverting pharmaceuticals, and ultimately for the profit of the owners, requires the practitioners to ignore certain indicators of potential diversion, i.e., "red flags," that competent and responsible practitioners, through their training and experience, would otherwise recognize. Through talking with law enforcement personnel involved in this investigation, knowledge of expert opinions gained in other investigations, and the admissions of practitioners prosecuted or investigated by the law enforcement, I have learned these red flags can include, but are not limited to the following:

- Patients who travel long distances, often from another state, to visit a particular doctor;

- Groups of people traveling together to visit the particular doctor;

- A single person paying for numerous people to see the doctor (i.e., use of a "sponsor");

- Patients requesting certain drugs or combinations of drugs;

7

&bull; Inappropriate drug screens and pill counts; and

&bull; A parking lot full of people waiting to get in to the pain clinic.

16.    In addition, I have learned through my training, experience, and knowledge of previous federal cases that practitioners often display certain "red flags" indicative of operating an illegitimate medical operation. These red flags include, but are not limited to the following:

(e) Widely prescribing large volumes of controlled substances;

(f) A cursory physical exam, or no physical exam at all;

(g) Seeing a high patient volume;

(h) Physician or other clinic personnel "coaching" patients concerning symptoms, including level/extent of pain, related to the alleged malady;

(i) Physician or other clinic personnel directing patients to particular pharmacies for filling prescriptions;

(j) The issuance of prescriptions to individuals that exhibit signs that the patient is either delivering the drugs to others and/or abusing the drugs;

(k) Lack of a bona fide treatment plan;

(l) Routinely prescribing combinations of controlled substances that pose a danger to patients;

(m) Controlled substances prescribed at intervals inconsistent with legitimate medical treatment;

(n) No logical relationship between the drugs prescribed and treatment of the alleged condition; and

8

(o) Continued prescriptions of opioids over time despite little or no evidence of improvement.

17. Further based upon my experience, training, and background, my participation in investigations pertaining to the illegal prescribing and dispensing of controlled substances, and other criminal activity, and my conversations with experienced law enforcement agents, I know the following to be true:

(p) Given that the goal of a pain clinic model of distribution is to maintain the appearance of legitimacy, the operator of an illicit pain clinic is typically faced with the task of funneling the cash and profits of the clinic into bank accounts and then distributing the assets in a fashion consistent with the profits of any other legitimate business. This activity, by its nature, requires the keeping of certain records including, but not limited to, records pertaining to the acquisition, conversion, movement, secreting, transfer, concealment and/or expenditure of the clinic's proceeds. Such records may be kept in the form of books, records, invoices, receipts, records of real estate transactions, purchase agreements, automobile titles, bank statements, financial statements, letters of credit, money orders, cashier's checks, safe deposit box agreements, among other forms. Proceeds may take the form of currency, financial instruments and investments, real estate, automobiles, boats, other vehicles, home furnishings, stocks, bonds, precious metals and gemstones, jewelry, electronic equipment, and other assets. Additionally, the persons responsible for the financial transactions of the pain clinic may utilize electronic equipment such as

9

computers, smart phones, and digital data storage devices to generate, transfer, count, record, or otherwise manipulate the records detailed herein.

## STATEMENT OF PROBABLE CAUSE

18.     The DEA, along with other law enforcement agencies, is investigating GMA, its owner, Dr. James Maccarone, and other individuals affiliated with GMA, for suspected controlled substance violations. My investigation indicates that Dr. Maccarone and other providers at GMA have utilized GMA to distribute Schedule II and IV controlled substances, to include oxycodone, oxymorphone, and benzodiazepines (Xanax), outside the scope of professional practice and not for a legitimate medical purpose. This Affidavit is based on information obtained through my own investigation of these matters, as well as information provided to me by other law enforcement officers who have participated in this investigation. I am familiar with all aspects of the investigation.

19.     In 2019, the DEA and the Commonwealth of Kentucky Attorney General's Office (AGO) began investigating Dr. Maccarone, his clinic GMA, and his questionable prescribing practices. Investigators learned that Kentucky residents were travelling long distances (approximately 238 miles each way from Barbourville, Kentucky to Clarksville, TN) to GMA to receive combinations of highly addictive controlled substances (oxycodone, oxymorphone, and a benzodiazepine) prescribed by Dr. Maccarone without a legitimate medical need. The Kentucky residents would then fill those prescriptions at Kentucky pharmacies, which then resulted in those same addictive controlled substances being diverted by members of Drug Trafficking Organizations (DTOs). Investigators have also identified Dr. John Stanton to be a provider at GMA.

## OVERVIEW OF GMA

20.     As noted, GMA is a putative medical practice in Clarksville, Tennessee. According to records I reviewed from the Tennessee Secretary of State, it appears Dr. Maccarone incorporated GMA in or around February 2000. According to an application submitted to the Tennessee Department of Health, in January 2012, Dr. Maccarone applied for a pain management clinic (PMC) certificate.  Dr. Maccarone was the owner and medical director with two mid-levels working under his supervision. That application was approved (PMC certificate #260). That clinic continued to operate in that format until the law changed in 2016, requiring the medical director to be a pain management specialist.  In May of 2016, Dr. Maccarone advised that Dr. Stanton would take-over as the medical director of GMA, and the certification was updated accordingly.  Shortly after that, Dr. Richard Adkins was added as the interim medical director (basically the back-up in case the medical director isn't available). In 2018, to comply with the new statutory scheme the Tennessee Board of Health received a new application for a PMC license, which was approved. Additionally, the Tennessee Board of Health clarified the differences between a "certificate" and a "license": They issue certificates to the owners of the PMC, and under the licensure statutory scheme, they issue the PMC license to the medical director.

21.     Further, below are details from a letter addressed to GMA, Attn: Dr. John Stanton, from the Tennessee Board of Health, Office of General Counsel, dated September 5, 2018, signed by Dr. Kenneth Lister (Medical Director for Pain Clinics for the Tennessee Department of Health), and in reference to the inspection pursuant to the Application for Licensure as Pain Management Clinic for Gateway Medical Associates (#760): "As a result

11

of your application for licensure pursuant to T.C.A. § 63-1-301 et seq, an inspection of this clinic was performed as required by law. That inspection and several patient records were reviewed by myself along with an attorney from the Office of General Counsel and some deficiencies were noted which we wish to bring to your attention. We noted that the charts reviewed evidenced prescription of high morphine equivalence daily doses ("MEDD") and also frequent prescription of benzodiazepines and/or muscle relaxants in combination with opioids which is deeply concerning. The Tennessee Chronic Pain Guidelines (which have been adopted by your licensing board, the Tennessee Board of Medical Examiners) direct practitioners to use the lowest effective dose of opioids, noting that data suggests that the risk of adverse event including overdose death is compounded at higher doses though increased risk can actually begin as early as 90mg MEDD. We suggest that you review the opioid dose of each patient to ensure that they are in fact at the lowest effective dose, wean patients as appropriate and document the justification where weaning is not appropriate. The Tennessee Chronic Pain Guidelines also state that "[b]enzodiazepines should be generally avoided in combination with chronic opioid therapy." We also note that the Guidelines require referral to a mental health professional when the opioid dose reaches 120mg MEDD and benzodiazepines are prescribed for mental health purposes. The records reviewed lacked sufficient explanation for these high doses and combinations. In particular, the records lacked support in the form of evaluation and consultative reports from other specialists and lack of discussion of other treatment options other than prescription of controlled substances. The Guidelines provide that "[a] treatment plan should be developed at the onset of treatment and is expected to include other treatments

12

or modalities beyond opioids, both non-pharmacological and pharmacological." The records also did not contain prior provider records to reflect previous treatments attempted. Finally, we note that James Maccarone, D.O. is a provider at this clinic and is under obligation via a Consent Order before the Tennessee Board of Osteopathic Examination. Given the terms and basis of that order and the information reviewed in these charts, we question whether he (and you) are over-extended to the point that neither of you may be able to attend to these patients as needed, given the risks involved in the treatment being provided. As a reminder, as the medical director for this clinic and pursuant to the pertinent laws and rules governing the clinic, you are responsible for all services provided at the clinic, that you are responsible for ensuring that all providers comply with the applicable laws and rules, that you are responsible for evaluating and monitoring the quality and appropriateness of patient care, and that you are responsible for ensuring appropriate medical documentation to justify that patient care. As such, it is the position of the Department and Board of Medical Examiners that your conduct in this matter could constitute a violation of T.C.A. § 63-6-21. 4(b)(l ) and (b)(14) of the Tennessee Medical Practice Act and grounds for disciplinary action against your medical license as well as grounds for action against the pain management clinic certificate pursuant to T.C.A § 63-1-316. This conduct is not consistent with the high standards of professional practice and you are advised that any further conduct of this nature could result in formal charges against you by the Tennessee Department of Health. Please consider the contents of this letter as an opportunity to review your clinic's processes and policies to achieve improvement. Also,

upon repeat inspection, the Department's inspectors will be specifically looking for compliance with these and all other rules."

22.    A search of the public Tennessee Department of Health Physician Profile page indicates that Dr. Maccarone's profession is listed as an Osteopathic Physician. An additional search of the American Board of Medical Specialties revealed that Dr. Maccarone had no board certifications listed.

23.    Investigators examined Dr. Maccarone's and Dr. Stanton's KASPER[1] records and discovered that patients with Kentucky addresses first received controlled prescriptions from either Dr. Maccarone or Dr. Stanton beginning in or around November 2009 and their combined total dosage units continued with a steady increase with Dr. Maccarone peaking in 2018 with approximately 266,976 annual dosage units of controlled substances and Dr. Stanton peaking in 2019 with 165,229 annual dosage units of controlled substances. Both Dr. Maccarone and Dr. Stanton have had slight decreases in their 2020 prescribing of controlled substances to patients with KY addresses, with Dr. Maccarone prescribing a monthly average of approximately 11,796 dosage units of controlled substances in 2020 compared to a 2019 monthly average of approximately 18,878 dosage units of controlled substances; and Dr. Stanton prescribing a monthly average of

---

[1] Kentucky, like many states, has established a Prescription Drug Monitoring Program ("PDMP") called the Kentucky All Schedule Prescription Electronic Reporting ("KASPER") system. Pharmacies are obligated by Kentucky law to enter a variety of information into KASPER about each controlled substance prescription they fill. Based on my training and experience, I believe that KASPER is a reliable source of information.

approximately 12,912 dosage units of controlled substances in 2020 compared to a 2019 monthly average of approximately 13,769 dosage units of controlled substances.

24.     KASPER records show that individuals travelled unusually long distances from Kentucky addresses to GMA as early as May 2014.  For example, one patient had an address in London, Kentucky, and London, Kentucky is approximately 215 miles each way to Clarksville, TN.

## KASPER ANALYSIS

25.     On August 3, 2020, Consultant Pharmacist, Jill Lee, RPh, with the Kentucky Cabinet for Health and Family Services Office of Inspector General (CHFS-OIG) reviewed Dr. Maccarone's controlled substance prescribing patterns using Kentucky All Schedule Prescription Electronic Reporting (KASPER) data for the previous two years (8/1/2018 through 7/31/2020).  Ms. Lee is a registered pharmacist who has training and experience in drug diversion investigations; she frequently conducts reviews of controlled substance prescribing patterns when working with CHFS-OIG.  In her review, Ms. Lee noted the following concerns: patients appear to be traveling long distances (up to 5 hours) to see Dr. Maccarone; a majority of patients receive a similar combination of oxycodone IR, oxymorphone ER, and gabapentin; many patients also receive a benzodiazepine or other sedative hypnotic in addition to the two-opioids/gabapentin combo.

26.     Ms. Lee's report further stated: According to CDC Chronic Pain Guidelines published in 2016, while there might be some situations in which clinicians need to prescribe immediate-release (IR) and extended-release or long-acting (ER/LA) opioids

together, in general, avoiding the combination is preferable, given potentially increased risk and diminishing returns of such an approach for chronic pain. The guidelines also recommend clinicians avoid prescribing benzodiazepines with opioids whenever possible. Dr. Maccarone commonly prescribed controlled substances concurrently, in a manner that would increase a patient's risk for serious adverse effects such as profound sedation, respiratory depression, overdose or death.

27.     A more recent review of Dr. Maccarone's and Dr. Stanton's KASPER data (01/01/2010 through 8/25/2020) was conducted by DEA investigators to conclude whether patients were still travelling long distances to GMA from Eastern Kentucky. The review revealed the following:

- In August 2020 (as of 8/25/20), there were still patients from Eastern Kentucky travelling long distances to receive prescriptions from Dr. Maccarone. For example, there were approximately 6 patients from London, KY, 4 patients from Manchester, KY, and 1 patient from Corbin, KY that received prescriptions from Dr. Maccarone in August 2020 (as of 8/25/20).

- In August 2020 (as of 8/25/20), there were still patients from Eastern Kentucky travelling long distances to receive prescriptions from Dr. Stanton. For example, there were approximately 3 patients from London,

KY, 2 patients from Manchester, KY, and 2 patients from Hyden, KY that received prescriptions from Dr. Stanton in August 2020 (as of 8/25/20).

## SURVEILLIANCE OF GMA

28.     As described in greater detail below, investigators conducted a series of undercover visits to GMA. During those visits, investigators observed vehicles with Kentucky tags parked at GMA, approximately eleven-hour wait times from initial visit to completion of visit, GMA operating unusual hours, specifically past 10:00 p.m. central time, and patients being told the doctor was not seeing anyone today and they would have to return tomorrow after approximate four to five-hour waits

29.     Further, on August 27, 2020, investigators from the DEA London Resident Office conducted surveillance of GMA. In summary and among other things investigators observed that GMA was still in operation and investigators observed Kentucky License Plates in GMA's parking lot.

## WITNESS INTERVIEWS

30.     On August 23, 2018, investigators interviewed CW-1 in regards to another investigation.   The following is a summary of the interview as it pertains to the investigation of Dr. Maccarone and GMA: CW-1 said her husband still uses pain medication.  CW-1 said her husband has been using pain medication longer than she ever did and he is addicted.   CW-1 said her husband receives his pain medication from Dr. Maccarone and he pays $285.00 in cash per visit.  CW-1 said her husband is also required

to pay $65.00 in cash every two (2) weeks for a "pill count". CW-1 said her husband has never been called or asked to do a pill count but is still required to pay. CW-1 said her husband will travel down to TN once per month to see Dr. Maccarone and when he does, he will leave the house at 8:00 AM and not return until 8:00 AM the following morning. CW-1 advised that her husband must wait all day to be seen and sometimes is not seen until 12:00 AM at night.

31.    On August 26, 2019, investigators from the London DEA office and the Barbourville Police Department interviewed CW-2. The following is a summary of the interview as it pertains to the investigation of Dr. Maccarone: CW-2 advised he began sponsoring individuals to go to a pain clinic located in Georgia in the spring of 2015. CW-2 stated he could not remember the name of the clinic, however, the doctor prescribing at the clinic had a last name of Stokes. CW-2 added that he and the members of his drug trafficking organization ("DTO") attended the clinic because it was the typical "pill mill". CW-2 advised Dr. Stokes wrote high amounts of opioids without medical necessity to all of the patients who attended the clinic. CW-2 stated he continued to operate the DTO until the DEA shut Dr. Stokes' practice down in late 2016 or early 2017. CW-2 then stated after the clinic in Georgia was closed the group found another pain clinic similar to Dr. Stokes' clinic, called Restoration of Murphy in North Carolina. CW-2 advised the prescribing physician at the clinic was a black male and CW-2 thought his name was Dr. Brown. CW-2 advised the group then began to go to Murfreesboro Pain to obtain controlled substances. CW-2 stated the prescribing physician at the clinic was named Dr. VanWinkle and he thought the owner of the clinic was a female, whose first name is Penny. CW-2 stated

18

Penny and a male subject from the Knox County area named James Foley had a personal relationship.

32.     CW-2 went on to add he most recently began sponsoring numerous individuals to go to a clinic located in Clarksville Tennessee called Gateway Medical. CW-2 stated the prescribing physician at Gateway Medical was a doctor named James Maccarone.  CW-2 stated Dr. Maccarone was an unusual individual who prescribed large amounts of opiates to his patients for cash payments with little concern for patient care. CW-2 advised he had not been treated by Dr. Maccarone, however, he had sponsored numerous individuals to obtain controlled substances from Dr. Maccarone.  CW-2 advised he sponsored the following individuals to obtain controlled substances from Gateway Medical: Ricky Witt, Charles Wooton, Denny Mills, Clyde Teague, Florence Harris, Marcia Martin, and Susan Jones.  CW-2 stated he sponsored the individuals financially in various ways, in order to obtain controlled substances from Gateway Medical. Most commonly, CW-2 would pay the office charge at the clinic, and the cost to fill the prescription at the pharmacy. In exchange, CW-2 would receive half of the controlled substances the individual received. CW-2 then advised he and the members of the above referenced DTO were filling the prescriptions obtained from Gateway Medical primarily at Parkway located in Barbourville, KY.

33.     On October 01, 2019, investigators interviewed CW-3 at the Barbourville Police Department.  The following is a summary of the interview as it pertains to the investigation of Dr. Maccarone and GMA:  Investigators asked CW-3 about a bottle of pills that had been located in CW-3's possession.  CW-3 stated they were his pills but they had

19

his wife's name on the bottle. CW-3 stated he took his wife to Clarksville, TN to see Dr. James Maccarone. CW-3 stated his wife would have an appointment for the day time. Dr. Maccarone wouldn't come to the office until around 6:00pm. At that time, Dr. Maccarone would start seeing patients. CW-3 stated his wife usually gets out of Dr. Maccarone's office around 2:00am the next day. CW-3 stated he would sleep in the car while his wife was inside waiting to see Dr. Maccarone. CW-3 stated that he and his wife would get back to Barbourville, KY around 6:30am.

34.     CW-3 further said he was sponsored to go to Dr. Maccarone by his brother, CW-2. CW-3 said his brother, CW-2, paid for the visit and once the prescription was filled they split the prescription and CW-2 got half the pills. CW-3 said the office visit was around $400.00. CW-3 stated that CW-2 gave him around $500.00. CW-3 said they would take the cash and put it on a credit card because Dr. Maccarone only accepted payment in that form. CW-3 stated that when he got home he would sleep a couple hours and take the prescription to Calvin Manis at Parkway to be filled. CW-3 stated that CW-2 would give him around $400.00 to get the prescription filled. CW-3 stated they paid cash to have it filled. CW-3 stated he would give the prescription and the cash to Manis and go wait in the car for about 10 to 15 minutes. CW-3 stated that the prescription was usually for 60 15mg Oxymorphone pills and 90 15mg Oxycodone pills.

35.     CW-3 stated that his wife had been going to Dr. Maccarone for about 8 months. CW-3 stated they normally go once a month to Dr. Maccarone and always have the prescriptions filled at Parkway. CW-3 stated his wife does not take any of the pills, but rather goes for CW-3. CW-3 stated his wife does have some pain but does not take the

pills. CW-3 stated that his brother, CW-2, told him about Dr. Maccarone and said he would sponsor CW-3. CW-3 stated that his brother had been sponsoring him to go to doctors for about 6 to 8 years. CW-3 stated that he went to a doctor in Broward County, Florida. CW-3 stated that CW-2 also sent him to a doctor in Murfreesboro, Tennessee. CW-3 stated that CW-2 actually took him to that doctor.

36. CW-3 stated that Fred Russell was another person sponsoring people to go to Dr. Maccarone. CW-3 stated that he did not deal with Fred Russell but CW-2 did. CW-3 stated that Fred Russell and CW-2 go to the same places but each are doing their own thing. CW-3 stated that some of the other people he has taken to Dr. Maccarone or other doctors are Jimmy Golden, Charles Wooton (aka Red), Susan Jones, and Freddie Jones. CW-3 said he took Charles Wooton to Dr. Maccarone. CW-3 stated he assumed his brother, CW-2, sent Wooton to Dr. Maccarone and he then took him to Manis' pharmacy to have the prescription filled. CW-3 stated that Wooton charged the bill for the prescription and CW-2 paid the bill. CW-3 stated that CW-2 gave CW-3 the money to pay for Wooton's office visit and his own visit. CW-3 stated that he had also charged his pills at Parkway in the past and CW-2 went back later and paid the bill. CW-3 stated that for the last 5 to 6 years his brother, CW-2, has paid for all of this. CW-3 stated that all he got out of it was some pills to take. CW-3 stated that he and his wife were going to Murfreesboro, TN and then he started her going to see Dr. Maccarone. CW-3 stated that CW-2 always paid and Parkway was where they always had the prescriptions filled. CW-

3 stated he was also going to a Dr. Stokes in Georgia and Tennessee and CW-2 also paid for those visits.

37.    On October 01, 2019, investigators interviewed CW-3's wife, hereinafter "CW-4".  The following is a summary of the interview as it pertains to the investigation of Dr. Maccarone and GMA: CW-4 stated CW-2 started CW-4 going to Murfreesboro to see Dr. VanWinkle; that was the first time CW-4 went to a doctor for CW-2.  CW-4 said CW-2 gives her husband (CW-3) the money to pay for the visit to the doctor.  CW-4 stated that she normally stays in the car when her husband gets the money from CW-2.  CW-4 stated CW-2 gives them enough money to cover the doctor visit and the prescription.  CW-4 stated that she had been going to see Dr. James Maccarone for about 6 to 7 months, maybe longer.  CW-4 stated that CW-2 paid for the first visit and set it all up.  CW-4 stated that after she gets the prescription she gives it to her husband and he does everything else.

38.    As described in greater detail below, investigators conducted a series of undercover visits to GMA using UC-1.  In the midst of UC-1's cooperation, UC-1 advised that UC-1 had been going to the doctor in order to obtain prescription medication to sell those prescriptions to CW-2. UC-1 also stated that UC-1 had to borrow some of the prescription medication from CW-2 so that UC-1 could pass a urine drug screen. Further, investigators debriefed UC-1 on February 20, 2020, to get a sense of UC-1's previous experiences as a patient at GMA.  UC-1 provided the following information: UC-1 has been going to GMA almost a year and found out about Dr. Maccarone through his/her friend CW-2; UC-1 and his/her spouse were going to a doctor in Lafollette, Tennessee before Dr. Maccarone, but could not remember the name of the clinic or the provider; UC-

22

1 brought an MRI that was approximately four years old when he/she first came to GMA; and Dr. Maccarone has never conducted a physical exam on him/her. UC-1 said he/she saw a different doctor, described as a male doctor, at GMA last year, but could not remember his name. UC-1 estimated that she saw him one to two times when Dr. Maccarone was not there. UC-1 said the unknown male doctor does injections and offered to do them on his/her back, but he/she did not want to do them. UC-1 advised that the unknown male doctor did not conduct a physical exam on him/her, and he did not keep him/her in the room or waiting room as long as Dr. Maccarone. UC-1 said the unknown male doctor would write your prescriptions and get you out of there. UC-1 said he/she received the same prescriptions from the unknown male doctor as he/she did from Dr. Maccarone. Based on other information uncovered in the investigation, investigators believe the unknown male doctor referenced above to be Dr. John Stanton.

39. UC-1 discussed drug screens and pill counts and provided the following details: the clinic conducts a urine drug screen every time; UC-1 has never shown up for a pill count; if you do not show up for a pill count, the clinic just charges you for it and the amount to be charged is written on the appointment card; no one asks why or tells him/her that he/she needs to come to the pill counts; and the clinic just tells him/her that he/she missed the pill count, therefore they are going to take it off his/her credit card.

40. UC-1 was asked about the prescriptions he/she receives from GMA. UC-1 provided the following information: UC-1 usually receives Neurontin 800mg, Roxicet (Note: UC-1 referred to the drug as Roxicet, which is a brand name of oxycodone 30mg, but all records reviewed indicated UC-1 is prescribed generic oxycodone 30mg) and

23

oxymorphone; his/her prescription has never changed and he/she has received those prescriptions since his/her first visit; there is nowhere in Kentucky to get those kind of prescriptions; UC-1 agreed that is why people travel to GMA; and the clinic never mentioned checking his/her KASPER report.

41.    UC-1 was asked about how long he/she waits at the clinic and provided the following information: UC-1 usually has to wait at least 7 hours and has waited as long as13 to 14 hours for a single visit; UC-1 has had to come back the next day because Dr. Maccarone was not coming in; Dr. Maccarone comes in between 4 p.m. and 5 p.m.; and UC-1 heard from another patient that Dr. Maccarone works at a nursing home too.

42.    UC-1 was asked about form of payment at GMA and provided the following information: everyone that comes to the clinic pays with a pre-paid card; UC-1 has WellCare, but the clinic has never asked for insurance to pay for an office visit; and Quest Diagnostic asked for insurance once to pay for a urine drug screen, but UC-1 did not have it with him/her.  UC-1 advised that you used to have to walk over to the adjoining suite to Quest Diagnostic, but they are located in the same suite now.  UC-1 said that Quest Diagnostic told him/her during the visit today that the doctor was separate from them. Further, UC-1 advised that Quest Diagnostic gave him/her a bill today for his/her labs and was told that he/she could make payments if needed.

**CONTROLLED VISITS TO GMA**

43.    Law enforcement has conducted six undercover (UC) operations at GMA. During this time, law enforcement observed vehicles with Kentucky tags parked at GMA,

approximately eleven-hour wait times from initial visit to completion of visit, GMA operating unusual hours, and patients being told the doctor was not seeing anyone today and they would have to return tomorrow after approximate four to five-hour waits. Two of the six UC operations were completed with audio/video recordings and one of the remaining four visits was completed with audio only because UC-1 terminated the video recording device due to fear of being discovered. The remaining three visits were not completed with audio/video recordings because law enforcement a utilized confidential informant to sponsor two unwitting patients to GMA. The two unwitting patients did not know of the DEA's operation and, accordingly, the DEA did not provide those individuals with audio/video recording devices. For that reason, the two audio/video recordings will be described below.

44. On January 13, 2020, UC-1 came to the DEA London RO and met with investigators. During the meeting, the UC-1 placed a phone call to GMA to schedule an appointment to visit Dr. Maccarone. UC-1 was initially advised that he/she owed a balance to the clinic and needed to make payment before they would allow him/her to schedule an appointment. Investigators believe that the balance was a penalty fee for missing a visit. UC-1 was provided with a money card loaded with confidential source funds. UC-1 placed another call to GMA and provided the card number and paid $495.00. UC-1 was then given an appointment for 11:30am central time the following day, January 14, 2020.

45. On January 14, 2020 UC-1 completed one audio/video recorded visit to GMA, but was told to come back the next day before UC-1 could see Dr. Maccarone. On January 15, 2020, acting in an undercover capacity, UC-1 completed an audio recorded

visits to GMA. UC-1 terminated the video recording device due to fear of being discovered. The following are some details in summary of that visit:

- On January 14, 2020, UC-1 CS entered the building at 11:32am central time.

- At approximately 12:45pm central time, UC-1 contacted TFO Williams and advised that he/she was ready to be picked up. TFO's Williams and Clark picked up the UC-1 from Gateway Medical Associates at 12:51pm central time and returned to the pre-determined location near the clinic and met with TFO's Janutolo and Jordan. UC-1 stated that while inside the clinic, lab work was completed and he/she was informed to return to the clinic at 4:00pm central for the doctor visit. UC-1 also stated that he/she paid $365.00 for the day's visit using a money card loaded with confidential source funds.

- At approximately 3:01pm central time, TFO's Williams and Clark dropped UC-1 back off at Gateway Medical Associates. As UC-1 was walking to the door, a male in the parking lot informed UC-1 that the doctor wouldn't be in that day. UC-1 continued inside and checked with the receptionist, who informed UC-1 that the doctor would not be in that day. UC-1 was instructed to come back the next day at 4:00pm central time. It is noted that UC-1 had already paid for the visit when having lab work done earlier in the day.

- The next day (January 15, 2020), at approximately 3:14pm central time,

26

UC-1 entered the building. At approximately 10:06pm central time, UC-1 contacted TFO Williams and advised that he/she was finished with the visit and was ready to be picked up. TFO's Williams and Clark picked up UC-1 at Gateway Medical Associates at 10:10pm central time.

- UC-1 received prescriptions for 1 for Oxymorphone 10mg 60 tab count, 1 for Oxycodone 30mg 100 tab count, 1 for Zanaflex 4mg 60 tab count, 1 for Neurontin 800mg 120 tab count, and a 1 for Narcan (all written by Dr. Maccarone), and appointment cards.

- One appointment card was given to UC-1 and was for January 29th, 2020 at 11:00am and had "$65" handwritten on the left side of the card and "$150" handwritten on the right side of the card. Handwritten above the $150.00 are the letters "NSF". UC-1 advised this appointment is for a pill count. UC-1 stated that the $65.00 is the price if UC-1 shows up for the pill count. If UC-1 doesn't show up for the pill count prior to the next office visit, the fee is $150.00. It is believed that "NSF" refers to a No Show Fee. The second appointment card given to UC-1 is for an office visit on February 12, 2020. On the left side of the card, "PPP $410" is handwritten as the amount for the office visit. On the right side of the card, "NSF $150" is handwritten, which is the No Show Fee for missing the pill count on January 29th. UC-1 advised that he/she thought either one of the GMA nurses or receptionist told him/her the above information about the pill count.

27

46.     A review of the recorded audio/video visit on January 14, 2020 revealed the following in summary: UC-1 completed blood work and a urine drug screen, GMA nursing staff took UC-1's vitals, and asked UC-1 questions pertaining to UC-1's medical history (i.e. asking about UC-1's pain, pharmacy, etc.). Before UC-1 could see Dr. Maccarone, UC-1 was told to come back on January 15, 2020 because Dr. Maccarone was not seeing patients that day.

47.     A review of the audio of the visit on January 15, 2020 revealed the following summary of UC-1's visit with Dr. Maccarone: Dr. Maccarone asked UC-1 if UC-1 was getting along, if UC-1 was making it, and if UC-1's brothers/family were helping; Dr. Maccarone tells UC-1 that he likes the numbers, and then talks to UC-1 about UC-1 moving and about a flood where UC-1 lives; Dr. Maccarone talks to UC-1 about CBD oil and wanting UC-1 to use a particular dose/strength; Dr. Maccarone talks with UC-1 about music; Dr. Maccarone asks UC-1 why they took so much from UC-1 at the window, UC-1 tells Dr. Maccarone that UC-1 had to cancel the appointment, and Dr. Maccarone tells UC-1 not to make a follow-up appointment that UC-1 cannot keep, and if UC-1 thinks there is a chance, tell them you will call back, and Dr. Maccarone tells UC-1 that he was trying to save UC-1 some money, and Dr. Maccarone notes, "$860.00." Dr. Maccarone directs a female in the room to do Narcan Nasal Spray for UC-1. Dr. Maccarone talks to UC-1 about drinking water, and Dr. Maccarone asks UC-1 if UC-1 came with anyone today and if he (Dr. Maccarone) is seeing them. Dr. Maccarone concludes the visit with telling UC-1 that UC-1 is good and to keep up the good work and to gain a little bit of weight. After listening to the audio, investigators concluded that it does not sound like Dr.

28

Maccarone conducts any type of physical exam on UC-1 himself nor does he specifically mention UC-1's pain levels or UC-1's current medication.

48.     On February 13, 2020 investigators met with UC-1. UC-1 phoned GMA to reschedule an appointment. UC-1 cancelled the appointment without direction or without advising law enforcement first. Therefore, investigators instructed UC-1 to reschedule the appointment in their presence. The receptionist at GMA informed UC-1 that they were full next week due to only being open four days because of the holiday. The receptionist told UC-1 they could not reschedule until sometime in March, unless he/she paid money. Investigators believe that payment was a pre-payment of the office fee. UC-1 placed a second call to GMA to pay the payment requested, which was $435.00 and rescheduled the appointment for February 20, 2020.

49.     On February 20, 2020, acting in an undercover capacity, UC-1 completed an audio/video recorded visit to GMA. The following are some details in summary of that visit:

- UC-1 entered the building at 2:53pm central time and completed his/her visit at approximately 9:30pm central time.

- UC-1 received the following five prescriptions: 1 for Oxymorphone 10 mg 60 tab count, 1 for Oxycodone 30 mg 100 tab count, 1 for Neurontin 800 mg 120 tab count, 1 for Zanaflex 1 mg 60 tab count and Vitamin D3. The prescriptions were all written by Dr. Maccarone.

- UC-1 was also given an order for imaging of his/her spine along with a bill from Quest Diagnostics.

29

50.     Following the February 20, 2020 visit, investigators debriefed UC-1 on his/her recollection of the visit.  UC-1 provided the following information: UC-1 signed in, was told he/she did not owe anything, and clinic personnel took his/her vitals to include his/her blood pressure; then a representative from Quest Diagnostics conducted a urine test; then he/she was called back to be seen by Dr. James Maccarone and he (Dr. Maccarone) went over bloodwork, told him/her that he/she had to have an x-ray on his/her lower lumbar area next time, talked to him/her about the music he was playing, and asked him/her about taking his/her Vitamin B shot.  UC-1 advised that Dr. Maccarone did not conduct a physical exam.  Further, UC-1 advised that he/she saw a red folder on Dr. Maccarone's desk and believed that to be his/her medical file because his/her bloodwork was contained in it.  UC-1 also stated that there was a new nurse, described as a young female, who took his/her blood pressure, printed off his/her prescription, and was in the room with him/her during his/her visit with Dr. Maccarone.

51.     A review of the UC-1's February 20, 2020 recorded audio/video visit with Dr. Maccarone revealed the following, in summary: when UC-1 entered Dr. Maccarone's office, there was a female seated next to Dr. Maccarone with a laptop; there was a large stack of papers on Dr. Maccarone's desk, and Dr. Maccarone is seen looking over and signing paper-work when talking to UC-1; Dr. Maccarone talks with UC-1 about music; Dr. Maccarone talks about x-rays of the lumbar spine UC-1 was supposed to have gotten (UC-1 is unaware of the x-ray UC-1 was supposed to have gotten) and then Dr. Maccarone gives UC-1 an order for the x-ray that is good for 30 days; Dr. Maccarone talks with UC-1 about a vitamin B-12 shot; Dr. Maccarone mentions that UC-1 had an MRI last year and

30

he wanted to him/her start out this year with an x-ray because it is cheaper; and Dr. Maccarone talks with UC-1 about UC-1's vitamin D being low and wants to prescribe vitamin D. During the office visit, Dr. Maccarone did not conduct any type of physical exam himself nor did he talk with UC-1 directly about UC-1's pain or current medication. Further, investigators concluded that GMA utilizes some form of electronic health record (EHR) as well as some form of paper medical record due to the fact that Dr. Maccarone was reviewing and signing paperwork during the visit with UC-1 and Dr. Maccarone appears to be dictating information to the lady with the laptop.

## POTENTIAL OVERDOSES

52.    On September 6, 2018, investigators received the documentation from the Knox County Coroner's Office pertaining to the death of Joey Sasser. Sasser was a patient of Dr. James Maccarone at the time of his death. Sasser's Kentucky Death Certificate lists the cause of death as combined toxic effects of oxymorphone and alprazolam. Sasser's date of death was October, 27, 2017. On the day prior to his death, Sasser filled a prescription written to him by Dr. James Maccarone. The prescription included 60 Alprazolam 0.5mg tablets, 90 oxycodone 10mg/325mg tablets, and 60 oxymorphone 15mg tablets. It was noted in the Coroner's Report that only 24 Alprazolam, 10 oxycodone, and 0 oxymorphone pills were found in Sasser's residence.

53.    According to medical records from Barbourville, KY Appalachian Regional Healthcare (ARH) Emergency Department: on July 23, 2020, patient MB was admitted and placed in ICU with the chief complaint as an overdose. One of the narratives stated

that MB is a, "43-year-old female who took 3 bars of Xanax sometime this evening according to her husband who had also taken some Xanax. EMS was called for decreased responsiveness. She received Narcan 2 mg pre EMS and Narcan 2 mg by EMS with slight improvement. Upon ER arrival patient to over taking some of her Opana ER, unknown mg, unknown time. She was hospitalized approximately 1-2 months ago with similar heroin overdose. She denies chest pain, shortness of breath, fever, travel, ill contacts. She has past medical history of opiate dependence for chronic back pain a MVC."

54.     According to KASPER data and Tennessee Controlled Substance Monitoring Database (CSMD) data for MB: MB has been a patient of Dr. Maccarone since at least September 5, 2019, and her most recent prescriptions were written by Dr. Maccarone on August 5, 2020 for oxycodone HCL 15mg 80 count, oxymorphone HCL ER 20mg 60 count, and gabapentin 800mg 120 count. Further, MB received prescriptions from Dr. Maccarone on July 7, 2020 (approximately 16 days prior to her overdose) for oxycodone HCL 15mg 85 count, oxymorphone HCL ER 20mg 60 count, gabapentin 800mg 105 count, and phentermine 37.5 mg 60 count. It is important to note that MB has received prescriptions from Dr. Stanton as well, to include oxycodone 15mg and oxymorphone 20mg.

## BACKGROUND ON MEDICAL RECORDKEEPING

55.     I know from my training and experience, and from consultation with other experienced law enforcement officers, that medical facilities almost always keep records of their activities, including records relating to patient care.  Typically, medical facilities keep records for each patient treated at the facility and these records include information

about, among other things: the patient's medical history, the prescriptions the patient is taking, the patient's vital statistics, the patient's "chief complaint" or history of present illness, a provider's diagnosis for the patient, and a treatment plan and prognosis. Furthermore, the Tennessee Board of Medical Examiners General Rules and Regulations Governing The Practice of Medicine Section 0.880-2-.15 requires that all medical records, or summaries thereof, produced in the course of the practice of medicine for all patients shall include all information and documentation listed in and T.C.A. 63-2-101 (c) (2), and such additional information that is necessary to insure that a subsequent reviewing or treating physician can both ascertain the basis for the diagnosis, treatment plan and outcomes, and provide continuity of care for the patient. Under Tennessee Board of Medical Examiners General Rules and Regulations Governing The Practice of Medicine Section 0.880-2-.15, medical records shall be retained for a period of not less than ten (10) years from the physicians or his supervisees' last professional contact with the patient.

56.     Based on my investigation, I believe GMA providers and staff keep both paper and electronic patient records. UC-1 confirmed that that he/she saw a red folder on Dr. Maccarone's desk and believed that to be his/her medical file because his/her bloodwork was contained in it. Additionally, review of the February 20, 2020 UC visit audio/video appear to show large amounts of paperwork on the physician's desk and that Dr. Maccarone appears to be writing during the office visit, all of which suggest that GMA also maintains some type of paper medical records. There was also a female with a laptop sitting next to Dr. Maccarone, and it appears that Dr. Maccarone is dictating information

33

to the lady, suggesting that GMA also utilizes some form of an electronic medical record (EHR). Further, annotated at the bottom of the prescriptions UC-1 received from UC-1's visits is "Copyright 2020 Quest Diagnostics Inc.", suggesting that Dr. Maccarone also utilizes an ePrescribing platform from Quest Diagnostics ("Quest").

57.     I made contact with Quest and a representative from Quest told me that GMA has had "Quanum" electronic health record ("EHR") system accounts since March 1, 2011, under account IDs 16079 SKB and account 16079 NAS. Data relating to the accounts is stored at Quest Diagnostics' Texas Data Center, 6431 Longhorn Dr. Irving, Texas 75063. Quest also stated that both Dr. Maccarone and Dr. Stanton are associated with the aforementioned accounts. GMA's use of an electronic EHR also makes it extremely likely the practice uses computers and other electronic devices in its day-to-day operations and that information that constitutes evidence of the crimes under investigation may be stored locally on those devices.

## SCOPE OF RECORDS SOUGHT

58.     I respectfully submit there is probable cause to search the information described in Attachment A all information described in Attachment B. The evidence outlined above shows that prescribing practices of the prescribers affiliated with GMA are not isolated to a single patient. Nor are the practices isolated to patients traveling from just one community within Kentucky. KASPER data also show that the suspicious prescribing was common, rather than isolated to a small group of patients. Accordingly, I believe it is necessary for law enforcement to obtain all the items listed in Attachment B, including medical records and other information for all patients with Kentucky addresses listed as

their place of residence because: (1) the evidence uncovered in this investigation indicates that the prescribers affiliated with GMA have been ignoring indicators of potential diversion, such as patients driving long distances and/or traveling in groups as set forth above, (2) evidence from the entirety of GMA's existence will potentially serve as an important point of comparison in determining whether any of GMA's practices changed over time; (3) patients at times switched between Dr. Maccarone and Dr. Stanton; and (4) the entirety of the patient's record will be necessary, to include notes from any GMA provider over the entirety of the patient's time with GMA, for an expert to review and render a complete opinion. Finally, a review of all items in Attachment B is necessary to establish all individuals involved in the crimes under investigation and each individual's level of involvement. This information will also aid investigators in determining the level of control exerted by GMA's owner, Dr. Maccarone.

59. Moreover, I know from my training and experience, and from consultation with other knowledgeable law enforcement agents, that a full review of GMA's patient files (that is, a review that is not limited to a select handful of patients or an isolated portion of a given medical file) is necessary to (1) fully evaluate the appropriateness of an EHC physician's treatment of the patient; (2) identify recurring trends and habitual practices across EHC physicians and employees; and (3) to compare the treatment of EHC patients to one another. The United States intends to retain a medical expert to conduct a review of a sample of GMA's patient files. In order to ensure the government's expert can provide an accurate and comprehensive evaluation of GMA's practices, the government must have access to all of GMA's patient files falling within the parameters of Attachment B.

Similarly, based on my training and experience, I believe it is necessary for law enforcement to obtain GMA's patient files from March 1, 2011 to the present (the time period the GMA Quest account has been active) because: (1) the evidence uncovered in this investigation indicates that GMA has been engaging in some of the problematic practices set forth above during this full time period; (2) patient files from earlier in GMA's operations will potentially serve as an important point of comparison in determining whether any of GMA's practices changed over time; and (3) accessing records from each patient's initial intake into the facility to the present (or the cessation of treatment) is needed to enable the government's expert to complete comprehensive review of that patient's treatment at GMA.

60.     Finally, a review of all patient files is necessary to establish all individuals involved in the crimes under investigation and each of those individual's level of involvement.  For instance, based on my training and experience, I believe the medical records will indicate which physicians (and/or other GMA employees): (1) saw a given patient; (2) counseled a patient; (3) and completed the medical record or other paperwork associated with the patient.  This information will also aid investigators in determining the level of involvement and control exerted by Dr. Maccarone, Dr. Stanton, and any others who may have held a supervisory position at GMA.

61.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Quest to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I

of Attachment B.  Upon receipt of the information described in Section I of Attachment B,

government-authorized persons will review that information to locate the items described

in Section II of Attachment B.

## **CONCLUSION**

62.    Based on the foregoing, I request that the Court issue the requested warrant.


_____/s/Anthony Janutolo_____

Anthony Janutolo
Task Force Officer
Drug Enforcement Administration


Subscribed and sworn to Per Rule 4.1(b)(2)(A) this _9th__ day of _October__, 2020.


United States Magistrate Judge

37

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information associated with Gateway Medical Associates, P.C. ("GMA"), Dr. James Maccarone, Dr. John Stanton, or any other individual associated with GMA that is stored at premises owned, maintained, controlled, or operated by Quest Diagnostics ("Quest") at 6431 Longhorn Dr., Irving, Texas 75063.

**ATTACHMENT B**
**Particular Things to be Seized**

**I.      Information to be disclosed by Quest**

To the extent that the information described in Attachment A is within the possession, custody, or control of Quest, including any messages, records, files, logs, or information that have been deleted but are still available, Quest is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.   All patient records and any other data associated with those records;

b.   All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the Internet Protocol ("IP") address used to register the account, log-in IP addresses associated with session times and dates, account status, e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.   Metadata or other information showing the dates and times any patient records were created, modified, or accessed, as well as the identity of the user taking such action;

d.   The types of service utilized by the user;

e.   All records or other information stored or generated by an GMA user;

f.  All records pertaining to communications between Quest and any person regarding the account, including contacts with support services and records of actions taken.

## II.  Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 21 U.S.C. §§ 841 and 846 relating to Gateway Medical Associates, P.C. ("GMA"), Dr. James Maccarone, Dr. John Stanton, or any other individual associated with GMA since March 1, 2011, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.  All medical records associated with current and former patients of GMA for patients with Kentucky addresses.

b.  The identity of the person(s) who created or registered the account, including records that help reveal the whereabouts of such person(s).

c.  The identity of the person(s) who were authorized to access the account, including records that help reveal the whereabouts of such person(s).

d.  The identity of the person(s) who made any entries into or edits to any record stored in the account, including records that help reveal the whereabouts of such person(s).

e.  The identity of the person(s) who accessed the account, the time of access, the geographic location and IP address from which the account was accessed, and the data that was uploaded, downloaded, or viewed.

f.  The identity of the person(s) who accessed the account, the time of access, the geographic location and IP address from which the account was accessed, and the data that was uploaded, downloaded, or viewed.

g. Any data or information showing the dates and times any patient records were created, modified, or accessed, as well as the identity of the user taking such action.